# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

James Williams and Marconia
Mitchell,

                 Plaintiffs,

v.

Brian Maurer, Russell Gartha,
Eric Jachym, Tyler Fegreus,
Patrick McCormick, Cole Armil,
and Trevor Elliott,

                 Defendants.

Case No. 19-10850

Judith E. Levy
United States District Judge

Mag. Judge Anthony P. Patti

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [23] AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [22]

Before the Court are cross-motions for partial summary judgment. (ECF Nos. 22, 23.) For the reasons set forth below, Plaintiffs James Williams and Marconia Mitchell's motion is granted in part and denied in part and Defendants Brian Maurer, Russell Gartha, Eric Jachym, Tyler Fegreus, Patrick McCormick, Cole Armil, and Trevor Elliot's motion is granted in part and denied in part.

## I.   Background[1]

This is a case of alleged excessive use of police force. On December 28, 2018 at 4:36 a.m., the Southfield Police Department received an anonymous 911 call reporting that "somebody just busted in my neighbor's [apartment]." (ECF No. 23-2.) The caller identified the apartment where the disturbance arose as number 103, which, unbeknownst to Defendants at the time, belonged to Mitchell. The caller stated that she heard a male and a female screaming and glass breaking, but that she did not know anyone's identities. The dispatch operator indicated that there was a "possible domestic" and that the caller believed "the door was kicked in before the screaming started."[2] (*Id.*)

---

[1] The parties provided the Court with a file with a body-camera audio recording of the encounter captured from Fegreus' body microphone, along with an in-car video recording from his police vehicle. (ECF No. 22-3.) There is also a 911 dispatch call recording. (ECF No. 23-2.) These recordings form the basis of the facts set forth unless otherwise indicated.

The Court considers the audio-video recordings of the underlying facts to be essential in understanding the background of this case. The Court attempted to embed this media into the opinion, but court technology is currently unable to accommodate a mixed-media filing. In the event that the Court becomes able to include the mixed media in a docket entry, it will issue an amended opinion and order.

[2] The police report indicates that Defendants were dispatched for a "possible home invasion in progress." (ECF No. 22-2, PageID.123.)

The apartment complex consists of several smaller multi-unit two-story buildings. (ECF. No. 22-11, PageID.458; 22-10, PageID.433.) The building at issue has a main front door with a glass-paned lobby and stairs leading to the second floor. (*Id*.) Apartment 103 is on the ground floor, and there several other units in the building. (*Id*.)

Defendant police officers Fegreus and McCormick[3] arrived on the scene at 4:42 a.m, which was approximately the same time as Defendant police officers Elliott and Armil arrived. (ECF No. 23-5, PageID.598.) Fegreus and Armil testified that when they arrived at the apartment complex, they heard a female scream but could not precisely identify which apartment it came from. (ECF No. 23-5, PageID.598; ECF No. 23-6, PageID.611.) Additionally, the officers saw no signs of forced entry at apartment 103 and heard no noise coming from the apartment. (*Id*. at 598–99.)

Fegreus and McCormick knocked on the door of apartment 103 for several minutes, but no one answered. During that time, Armil

---

[3] Fegreus testified that he was also acting as a field training officer for McCormick on the night of the incident. McCormick had been in training for approximately one week before the incident. McCormick drafted the police report, which Fegreus reviewed before submitting it. (ECF No. 23-5, PageID.597.)

discovered a broken window outside of apartment 103; the outer glass pane was broken, but the inner pane remained intact. (ECF No. 23-6, PageID.611; ECF No. 23-4, PageID.588.) Armil testified that the broken window could not have been a point of entry into the apartment, and he stated that he could not see any people or criminal activity in the apartment through the window. (ECF No. 23-6, PageID.611.) He also observed a grate on the window. (*Id.*; *see also* ECF No. 22-11 (photos of the window).)

Fegreus and the other Defendants then discussed their efforts to identify the source of the screaming that they heard when they arrived. (ECF No. 23-3.) Fegreus said, "We don't think it's in 103," and, "Trevor [Elliott] said he heard it upstairs. I don't know where it's from." (*Id.*) At approximately 4:45 a.m., Defendants requested that dispatch confirm the apartment number, because apartment 103 was "locked and there's no answer and it's all quiet as of now." (ECF No. 23-2.)

Dispatch contacted the anonymous 911 caller again to confirm the apartment number, and, at approximately 4:47 a.m., the dispatch operator told Defendants that the 911 caller "could not be positive what

4

apartment it was coming from" but that she had heard glass breaking and people screaming. (*Id*.)

While Defendants continued to knock on apartment 103 and announce that they were from the police department, one of the Defendants[4] is asked whether they should "boot the door." (ECF No. 23-3.) Another Defendant responded that they would have to "check with the boss first," causing at least one Defendant to laugh. (*Id*.) Around this time, Defendant police officers Jachym, Maurer, and Gartha arrived at the scene. (ECF No. 23-5, PageID.598.) During the approximately five to six minutes of knocking, the officers did not hear screaming or any other noise coming from inside apartment 103. (ECF No. 22-7, PageID.311.)

After about five minutes of knocking, Mitchell answered the door and partially opened it. (ECF No. 23-5, PageID.599.) Defendants testified that they did not observe any visible injuries on Mitchell. (*See* ECF No. 22-5, PageID.191; ECF No.22-6, PageID.260; ECF No. 22-7, PageID.313; ECF No. 22-8. PageID.360.) Mitchell testified that, although Defendants could not see her full body, she "cracked [the door] enough for them to see

---

[4] The Court cannot discern from the audio recording which Defendant made these statements.

that everything was okay and intact, but not [to give] them access to my apartment." (ECF No. 22-12, PageID.514.)

Defendants' testimony regarding the conversation that ensued differs from the audio recording. For example, Fegreus testified that, after Mitchell opened the door, "I ask[ed] what was going on saying that we heard a male and female screaming and that your window's broken." (ECF No. 22-7, PageID.312.) Elliott testified that "I remember explaining to her why we were there and why we were forcing entry in there, because we had exigent circumstances to go in there to confirm the safety of her, if there was possibly anybody else in there." (ECF No. 22-6, PageID.261.) Armil testified,

> [a]fter knocking for a period of time and announcing our presence as Southfield Police, the door opened. Ms. Mitchell was the one who opened the door. We stated why we were there. We tried to explain to her that we wanted to check the safety of the occupants inside the apartment. We told her that we heard—or someone called regarding screaming and glass breaking.

(ECF No. 22-5, PageID.190.) However, the audio recording of the encounter demonstrates that Defendants did not explain to Mitchell why they were at her door; instead, when Mitchell answered the door, one Defendant said, "Hey how you doing? What happened to your window?"

6

(ECF No. 22-3.) The closest that Defendants came to explaining the situation to Mitchell was when one Defendant told her, "Because we got that people were fighting and then there was a glass break." (ECF No. 22, PageID.96.)

Mitchell stated that she thought someone threw a rock at her window and ran off but that she was "fine." (*Id*.) She later testified that she initially thought the police were at her residence because of her broken window, which had been broken the week before. (ECF No. 22-12, PageID.511.) She stated that she made up the story about the rock because she was afraid that she had damaged property that belonged to her landlord:

> They were banging on my door. It was like four or five police officers. When I opened the door, I was scared, like they—the way they looked like they were coming to do something. So I felt like, I mean, it's not my property. If I broke my own window, I could have been sent to jail, so that's—it—I was terrified.

(*Id*.)

Defendants asked her if someone was "screaming and yelling," and Mitchell denied it, saying "I'm ok." (ECF No. 22-3.) She also explained that it took her some time to answer the door because she had been

asleep. (*Id*.) Mitchell then attempted to close the door. (ECF No. 22-7, PageID.316.) She was unable to close the door, however, because McCormick had placed his boot in the door frame, blocking her ability to do so. (*Id*. at PageID.600–01.) McCormick testified, "I had my foot in the door. And then [Mitchell] proceeded to try and to shut the door on my foot. And eventually myself and other officers went inside the apartment." (ECF No. 22-8, PageID.359.) Fegreus described Defendants' entry as follows, "I placed my shoulder into the door to open it, because it was—it wasn't closed. The door wasn't closed, but while it was closing and hit Pat's [McCormick's] foot, I placed my shoulder into the door causing it to open, and I walked inside the apartment." (ECF No. 22-7, PageID.337.)

At about this point in the audio recording, Mitchell said, "excuse me, you don't have anything to–. . .," "no, no, no. . . you can't just bust in my door." (ECF No. 22-3.) Defendants responded to her, saying, "relax, relax," and, "we've got exigent circumstances." (*Id*.) As Fegreus, McCormick, Armil, Gartha, and Elliott entered the apartment, Mitchell alleges they hit her leg with the door, causing it to bleed and leaving a permanent scar. (ECF No. 22-12, PageID.515.)

Defendants observed Williams for the first time after they entered the apartment. (ECF No. 23-2, PageID.605.) Armil described Williams as "standing still" in the hallway. (ECF No. 23-6, PageID.613.) McCormick described Williams as having "bloodshot eyes and slurred speech." (ECF No.22-8, PageID.375.) Fegreus testified that Williams was wearing only boxer shorts. (ECF No. 23-2, PageID.602.) Fegreus and Armil testified that Williams began to take a step back into the bedroom. (ECF No. 23-4, PageID.592; ECF No. 23-6, PageID.613.)

At this point in the audio recording, the Defendants shouted, "Get down on the ground!"; "You're gonna get tased!"; "Roll on your stomach!"; and "Put your hands behind your back!" (ECF No. 22-3.) Mitchell is recorded shouting, "Are you going to kill us?"; "Oh my god, somebody help!"; and "Oh my god, what are you all doing?" (*Id*.) Williams is recorded shouting, "I'm not doing nothing!"; "I'm putting my hands like this!"; and, "What are they doing to me?" (*Id*.)

Armil testified that Williams had one of his hands obscured behind his back and, since he could not tell whether Williams had a weapon in his hand, Armil felt he had probable cause to arrest Williams. (ECF No. 23-6, PageID.613.) Fegreus testified that he saw Armil grab Williams by

9

the shoulders. (ECF No.22-7, PageID.323.) Although Fegreus testified that his view was obstructed, he stated that he saw Armil force Williams to the ground. (*Id*.) Fegreus testified that Williams did not try to punch or kick the officers while Defendants handcuffed him. (*Id*.)

At about this point in the audio recording, Mitchell said that she did not understand why Defendants were in her apartment without a warrant. Defendants did not answer her questions or explain why they were in the apartment. Mitchell told Defendants that she had a lawyer, and one of the Defendants responded, "then call a lawyer, I don't care!" (ECF No. 22-3.) Mitchell also told Defendants that she had rights and that Defendants should not be in her apartment; one of the Defendants responded, "oh, oh, ok . . . [inaudible] so did you learn all the laws?" When she responded, "no," that Defendant then said, "Ok, so now you don't know?" Mitchell again stated that she thought Defendants should not be in her apartment, to which one Defendant replied, "oh, oh, oh, you do?"(ECF No. 22-3.) Mitchell testified that,

> [t]hey came—two officers were in my bedroom, came in my bedroom—well, walked into my bedroom. And I asked them what they were in my bedroom for, and they asked can they search [Williams'] jeans, and I told them no, they carried him out the house, there was no reason for them to be in my

10

apartment. They started laughing, and I told them I was going to call my lawyer if they didn't leave, and then they left.

(ECF No. 22-12, PageID.524–525.)

Fegreus testified that he and other Defendants began to remove Williams from the apartment but at some point, Williams fell, so they carried him out. (ECF No. 23-6, PageID.603.) Williams is recorded telling Mitchell to call the sheriff, and one of the Defendants responds, "we are the police, idiot." (ECF No. 22-3.)

Fegreus' dashboard video camera recorded Defendants carrying Williams, wearing only his boxer shorts, to the police vehicle, while he said, "oh my god you all are treating me like I'm a f-__ing criminal." (*Id.*) One Defendant responded, "well you are now." (*Id.*) The dashboard camera recording of Williams in the squad car shows that he was silent for the entire ride to the station. (*Id.*)

Armil testified that he conducted a search of the apartment after Williams was arrested and that he found no contraband, weapons, or drugs. (ECF No. 23-6, PageID.619.) The police report indicates that Williams was arrested for resisting arrest and obstruction of the police. (ECF No. 22-2, PageID.120.) Criminal charges against Williams were later dropped. (ECF No. 23.)

11

In their complaint, Plaintiffs deny that the initial disturbance originated from Mitchell's apartment. They argue that Defendants never should have entered the apartment or arrested Williams. Plaintiffs bring counts against Defendants as follows: Plaintiffs both allege that all Defendants are liable under 42 U.S.C. § 1983 for unlawful entry; Williams-only alleges that all defendants are liable under § 1983 for excessive force; Mitchell-only alleges that Fegreus, McCormick, Elliott, and Armil are liable under § 1983 for excessive force; Williams alleges that all Defendants are liable under § 1983 for false arrest; Williams alleges that Maurer, McCormick, Gartha, Fegreus, Armil and Elliott-only (but not Jachym) are liable under § 1983 for malicious prosecution. (*See* ECF Nos. 1, 31.)

In their summary judgment motion, Plaintiffs move for partial summary judgment as to Defendants' unlawful entry, excessive force, and Williams' false arrest count only (but not Williams' malicious prosecution count). (ECF No. 23.) In their cross-motion for summary judgment, Defendants contend that qualified immunity shields them from liability on Plaintiffs' unlawful entry and Mitchell's excessive force

12

counts only.[5] (ECF No. 22, 28.) They also argue that Williams' false arrest argument ignores certain testimony that creates a material factual dispute. (ECF No. 28.) Defendants do not cross-move or assert qualified immunity as to Williams' excessive force count or malicious prosecution count. (*Id.*)

## II.    Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III.    Analysis

---

[5] Plaintiffs stipulated that summary judgment should be granted for Defendants as to Mitchell's excessive force count against Maurer, Gartha, and Jachym only. (ECF No. 27, PageID.850.)

## A. Unlawful Entry

### 1. Standing

As an initial matter, both Plaintiffs have standing to bring an unlawful entry claim under the Fourth Amendment. Both had a reasonable expectation of privacy in Mitchell's apartment. Mitchell was renting the apartment and residing in it, and Williams was a regular visitor who stayed overnight four to five nights per week. (ECF No. 22-12, PageID.496–97.) Mitchell, as an apartment renter, had a reasonable expectation of privacy in her home under the Fourth Amendment. *See United States v. King*, 227 F.3d 732, 743–45 (6th Cir. 2000). Williams, as a regular houseguest, shared those rights. *See Minnesota v. Olson*, 495 U.S. 91, 98–100 (1990) (holding that houseguests are not excluded from Fourth Amendment protection).

Plaintiffs do not make individualized arguments with respect to each Defendant on their unlawful entry claim. Although McCormick was the first to place his boot in the threshold of the door, McCormick, Fegreus, Elliot, and Armil entered the apartment at approximately the same time followed soon after by Gartha, Jachym and Maurer. Accordingly, the same analysis applies to all Defendants.

2. *Defendants' Motion for Summary Judgment: Qualified Immunity*

Defendants argue that qualified immunity protects them from Plaintiffs' unlawful entry claim. (ECF No. 22, PageID.111–113.) Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides protection to government officials who make reasonable yet mistaken decisions that involve open questions of law. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

There is two-prong inquiry for resolving qualified immunity claims. First, the Court "must decide whether the facts that a plaintiff has alleged (*see* Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (*see* Rules 50, 56) are a violation of a constitutional right; and second, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The "clearly established" inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 244. The law is "clearly established" when the officers reasonably believed their conduct complied with the law in place at the time, including existing lower court

cases. *Id*. at 244–45. The Court may determine these inquiries in any order it deems fair and efficient. *Id*. at 236–243.

It is well-established that an officer may not enter a home absent a warrant or an exception to the warrant requirement. *Barton v. Martin*, 949 F.3d 938, 949 (6th Cir. 2020) (citing *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). Because "warrantless entry into a home without an exception to the warrant requirement violate[s] clearly established law," *id*., the relevant inquiry becomes whether the facts viewed in the light most favorable to the nonmoving party demonstrate that there was an exception to the warrant requirement. *Id*. at 947.

Here, Defendants argue that they had a lawful right to enter the apartment under the "exigent circumstances" exception to the warrant requirement. Exigent circumstances are situations where "'real immediate and serious consequences'" will "certainly occur" if the police officer postpones action to obtain a warrant. *Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)).

There are four situations where the exigent circumstances exception to a warrant may apply: "(1) hot pursuit of a fleeing felon, (2)

imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *Thacker*, 328 F.3d at 253 (quoting *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994)). Defendants argue that the "risk of danger to the police or others" circumstance applies here because they (1) heard signs of violent or suspicious activity on arrival; and (2) had indications that someone in the apartment may be in distress, particularly with "known dangers associated with domestic disturbances." (*Id*. at PageID.111–112.). (ECF No. 22, PageID.102–103.) The fact that the 911 caller reported screaming, glass breaking, and the apartment door being kicked in—all of which the caller believed came from apartment 103 supports this position.

However, whether Defendants' belief was reasonable at the time of entry into Mitchell's apartment is a different matter. When the facts are viewed in the light most favorable to Plaintiffs, no exigency existed at the time the officers entered Mitchell's apartment.

Upon arrival, several Defendants testified that they heard a female scream. However, none of the Defendants were able to identify the origin of the scream, much less to determine that it came from Mitchell's

17

apartment. Despite the 911 caller's statement to the police that "somebody just busted into my neighbors' [apartment]," there were no signs of any disturbance outside of apartment 103, and the door was intact and closed. While Armil observed a broken double-paned window to apartment 103, the fact that it was double paned glass, and only the outer pane was broken weigh against Defendants' assertion that he believed there was an intruder. Also, the window had a grate on it that would have made a forced entry obvious.

As set forth above, Defendants' uncertainty is clear from the audio recording. Fegreus is recorded saying, "we don't think it's coming from 103." He also stated that Elliott, "thought [the screaming] was coming from upstairs;" and, "I don't know where it's coming from." Fegreus and the other Defendants were so uncertain of the location of the alleged disturbance that Fegreus called dispatch to confirm the apartment number. However, rather than affirm that the disturbance came from Mitchell's apartment, the 911 caller stated that she was "not positive" which apartment the disturbance came from.

The fact that Defendants laughed as they discussed the possibility of booting the door to apartment 103 and checking with the boss first also

18

cuts against Defendants. Defendants themselves did not appear to believe that exigent circumstances existed at the time, given that they were laughing about calling their boss to boot the door open.

Further cutting against Defendants' position is Mitchell's demeanor when she answered the door. Defendants knocked on apartment 103 for approximately six minutes. After Mitchell answered the door, she stated she was "fine," and that the delay was because she was asleep. It was, after all, approximately 4:50 a.m. Defendants did not observe any illegal activity or signs that Mitchell was injured or in any distress. Given the facts set forth above, and the uncertainty surrounding the location of the alleged disturbance, Mitchell's response that the disturbance was not at her apartment was plausible. Moreover, Mitchell, though fearful, was cooperative with Defendants before McCormick put his boot in the threshold and Defendants forced the door open.

When viewed in the light most favorable to Plaintiffs, the only evidence that Defendants had linking Mitchell's apartment to any potentially exigent circumstance was the first anonymous 911 call. However, the 911 caller refused to provide any information about herself, including a description of the occupants of apartment 103. Although

anonymous 911 callers are considered to have greater reliability than that of non-emergency anonymous tipsters, *see Robinson v. Howes*, 663 F.3d 819, 830 (6th Cir. 2011) (citing *United States v. Hicks*, 531 F.3d 555, 559 (7th Cir. 2008) (listing circuit decisions affording greater reliability to emergency calls than to anonymous tips concerning general criminality)), the caller here provided only minimal information, and then back-pedaled regarding the location of the disturbance minutes later.

For these reasons, a reasonable juror could find that Defendants violated Plaintiffs' clearly established constitutional right against unlawful entry, and that no exigent circumstances existed..

Defendants nevertheless argue that this case is similar to *Thacker v. City of Columbus*, 328 F.3d 244 (6th Cir. 2003). In *Thacker*, Gallagher and her fiancé Thacker went out for the evening drinking and then continued to drink after returning to Gallagher's home. *Id*. at 249. Once back at home, Thacker dropped a glass bottle on the floor, slipped and fell on it, and cut his wrist. *Id*. Finding blood on Thacker's hands, legs, and shorts, Gallagher called 911 and reported an emergency: that her fiancé's wrist was cut and bleeding and that she did not know how it

happened. When Thacker answered the door, the paramedics and police could see broken glass on the floor behind Thacker, along with an indentation in the wall with a liquid stain beneath it. Thacker's hand was bleeding profusely, and blood was on his body. Officers could also discern that Thacker was intoxicated. Thacker gave paramedics, but not the police, permission to enter.

Nonetheless, the police made a warrantless entry into the apartment to investigate a possible crime, assist Thacker and any other injured persons, and determine whether it was safe for paramedics to enter. Afterwards, Thacker sued the officers for, among other things, unlawful entry. The defendant officers raised qualified immunity in their defense and argued that their warrantless entry into the home was permissible due to a "risk of danger" under the "exigent circumstances" exception to the warrant requirement.

On review, the Sixth Circuit found that "the totality of the circumstances, including the 911 emergency call, Thacker's conduct, and the uncertainty of the situation, justified entry to secure the safety of the police, paramedics, and other people possibly inside the home." *Id.* at 254. The Court cited the 911 call, which specifically reported a cut or stab,

Thacker's bloodied appearance and profuse bleeding when he answered the door, his belligerent and intoxicated state, his failure to explain his injury, and the fact that police could see the broken glass on the floor and hole in the wall behind him at the door. *Id*. The Sixth Circuit found these circumstances to present "a close question" and ruled in favor of the officers. *Id*.

This case, on the other hand, is not a "close question." The 911 caller here was not a resident of apartment 103 and did not report seeing anything specific in the apartment. When Mitchell answered the door, Defendants testified that they did not see any signs of injury on her at all, much less bleeding which was the case in *Thacker*. Nor did Defendants see any signs of disturbance or illegal activity behind Mitchell when she answered the door, nor was she apparently intoxicated or belligerent. And contrary to the anonymous caller's description, the door was not bashed in as the anonymous caller had described. While Defendants may have had reason to be concerned for whoever was screaming in the multi-unit dwelling, Defendants have not set forth an adequate connection between the screaming and Mitchell or her apartment. There is no showing that an exigency prevented them from

obtaining a warrant before entering Mitchell's apartment. Moreover, the uncertainty about which apartment had a disturbance in this case further distinguishes it from *Thacker*, where there was no doubt that an incident had occurred in the unit the officers entered. This case is very different from *Thacker*.

Defendants also argue that their case is similar to *Michigan v. Fisher*, 558 U.S. 45 (2009). *Fisher* is not a § 1983 qualified immunity case, but the standard used is the same. In *Fisher*, officers were called to a residence where a man was reportedly "going crazy." *Id*. at 45. Upon arrival, they saw a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows with glass on the ground outside. *Id*. at 45–46. They saw blood on the hood of the pickup and on the clothes inside of it, as well as on the door to the house. *Id*. at 46. They could also see an individual, Fisher, inside the house through a window, screaming and throwing things. Fisher refused to answer the door, and officers saw a cut on his hand. They entered the house.  Fisher argued that this entry violated his Fourth Amendment rights and sought to have the evidence seized suppressed in his criminal case.

23

Under the totality of the circumstances set forth above, the Supreme Court found that the emergency aid exemption applied. It found that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Id*. at 49. Instead, the officers need only show that there was "an objectively reasonable basis for believing" that entry was lawful. *Id*.

The circumstances in this case are not at all like those in *Fisher*, where there was literally a bloody trail leading to Fisher's door and Fisher could be seen acting erratically through the window. Defendants here could not see any signs of disturbance on Mitchell's body or in her apartment, and they had no idea which apartment in the multi-unit dwelling the disturbance came from.

Similarly, Defendants comparisons to *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006) and *United States v. Johnson*, 22 F.3d 674 (6th Cir. 1994) are unhelpful. *Brigham City* involved a house party where the officers could plainly see illegal activity upon their arrival. And *Johnson* involved a kidnapping victim who answered the door and told officers she was the missing person they were looking for. These cases are not applicable.

24

Finally, Defendants point to *Gibson v. O'Donnell*, 254 F. Supp. 3d. 913 (E.D. Mich. 2017) (Lawson, J.), In *Gibson*, the defendant officers responded to a neighbor's complaint about an argument in progress at Gibson's apartment. No one answered the door after about 40 minutes, despite the obvious presence of occupants inside the residence. The officer broke through the door to investigate and found two occupants in the shower. They denied that a disturbance had occurred in their apartment. There, Judge Lawson found that a constitutional violation occurred with the entry, but that the Fourth Amendment right the defendants violated by breaking down the door and entering the plaintiff's apartment was not clearly established at the time of the conduct.

Unlike here, in *Gibson* there were no facts that set forth any confusion about whether the residence was the correct source of the reported disturbance. And unlike *Gibson*, where no one answered the door and left officers wondering whether the occupants of the apartment were safe, Mitchell answered the door, denied a disturbance, and showed no signs of injury or distress. Accordingly, like *Gibson*, a constitutional violation occurred with the entry. But unlike *Gibson*, the violation in this case was clearly established because Defendants had significantly more

information that contradicted a reasonable belief of exigency inside Mitchell's apartment than the officers had in *Gibson*.

Accordingly, for the reasons set forth above, qualified immunity does not shield Defendants from liability on Plaintiffs' unlawful entry claim. Defendants' motion for summary judgment is denied.

### 3. *Plaintiffs' Motion for Summary Judgment: Unlawful Entry*

Plaintiffs cross-move for summary judgment against all Defendants on this claim. Even though qualified immunity does not shield Defendants from liability, this does not automatically confer summary judgment in favor of Plaintiffs. Rather, when the facts are viewed in the light most favorable to the Defendants, there are genuine disputes as to issues of material fact such that a jury could decide that they entered the apartment lawfully.

For example, Elliot testified that when Mitchell opened the door, she did so "very hesitantly. I noticed she was looking through, and kind of giving short answers. And I remember officers asking questions and she was being very short and vague." (ECF No. 22-6, PageID.252.). Fegreus testified that the broken glass found outside the apartment (though, the inner windowpane was intact and there was no indication

that the window had been broken recently) was a potential source of concern. When Mitchell attempted to shut the door, Fegreus testified, "I could not see inside the apartment to make sure everybody was safe and okay due to the glass break, the dispatch call saying that a male and female were screaming, so in order to make sure everybody was safe, I entered the apartment." (ECF No. 22-7, PageID.316.) A reasonable juror could determine that Defendants had a reasonable exigent cause to investigate further and enter the apartment.

Accordingly, Plaintiffs have not met their burden to show that summary judgment should be granted in their favor when viewing the facts in the light most favorable to Defendants.[6] Accordingly, Plaintiffs' motion is denied.

## B.    Excessive Force

Next, Mitchell moves for summary judgment on her excessive force claim against Fegreus, McCormick, Elliott, and Armil, and Williams moves for summary judgment on his excessive force claim against all Defendants. The Fourth Amendment protects individuals from excessive

---

[6] The denial of summary judgment does not preclude a motion for directed verdict once the evidence has been presented at trial. This issue may be appropriate for a directed verdict at that time.

force "in the context of an arrest or investigatory stop. . ." *Graham v. Connor*, 490 U.S. 386, 294 (1989).

       1.   *Mitchell v. Fegreus, McCormick, Elliott, and Armil*

As set already forth above, Mitchell moves for summary judgment on her excessive force claim against Defendants Fegreus, McCormick, Elliott, and Armil-only. Defendants cross-move for summary judgment against Mitchell on this claim asserting that they are protected by qualified immunity. The Court will first analyze whether Mitchell has provided evidence from which a jury could find that Defendants used excessive force against her, and then whether the right was clearly established at the time it was violated. *See Judd v. City of Baxter, Tenn.*, 780 F. App'x 345, 348 (6th Cir. 2019). As set forth above, the test is "whether there was clearly established law at a sufficient level of specificity to put a reasonable officer on notice that the conduct at issue was unconstitutional." *Id.*

As an initial matter, Mitchell has set forth evidence from which a reasonable jury could find that Fegreus, McCormick, Elliott, and Armil violated her constitutional right against the use of excessive force, and that the right was clearly established at the time of the conduct. Here,

28

the parties do not dispute that Plaintiff was trying to close her door when Defendants pushed it open and hit her with it, causing pain, a bleeding cut on her leg, and a permanent scar.

Defendants argue that the force here was nothing more than *de minimus*. "[A]n excessive-force claimant must show something more than *de minimis* force." *Leary v. Livingston County*, 528 F.3d 438, 443 (6th Cir. 2008) (citations omitted). *Leary* measures force in part by looking at the nature of the injury. When analyzing the level of force and finding it nothing more than *de minimis*, the Court noted that "[t]here was no hospital visit after the encounter, no doctor's visit, no bruise, nothing in short to indicate that the encounter rose above a 'negligible [use of] force' or caused anything more than a 'trifling injury.'" *Id.* (citing *Riley v. Dorton*, 115 F.3d 1159, 1167 (4th Cir. 1997) (*en banc*)).

Yet, another factor set forth in *Leary* to determine the reasonableness of force is whether the victim experienced pain. In finding the force *de minimus*, the Sixth Circuit emphasized that Leary admitted that the officer's actions did not hurt him. *Id.* However, in *Carlton v. Turner*, the Court stated that even a minor injury with minimal pain can

result in recovery where the force "drew blood." No. 05-1009, 2006 WL 955886, at *2 (6th Cir. Apr. 12, 2006).

Here, Mitchell's allegations involve a single incident of force: the door hitting her knee when Defendants pushed it open. (ECF No. 23, PageID.575.) Although she refused medical attention at the time of the incident (ECF No. 23-4, PageID.589), she testified that the blow from the door caused "a little cut on my knee and it started bleeding." (ECF No. 23-12, PageID.722.) She also testified, "I don't think it needed stitches, but it was big enough to continue to bleed the rest of the night." (*Id*.) Accordingly, Mitchell has set forth evidence to show that the injury was more than *de minimus* and was caused by one or more of the Defendants forcing the door to her apartment open. It therefore rises to the level of a constitutional violation that was clearly established at the time Defendants acted. Accordingly, Defendants' motion for summary judgment based on qualified immunity is denied.

Plaintiff's motion for summary judgment on this claim is also denied. Based on the facts set forth above, including Mitchell's admission that her injury did not require medical attention, a reasonable jury could find in favor of Defendants. Accordingly, both parties' motions are denied.

2.    *Williams v. McCormick and Armil*

While Williams' complaint alleges excessive force against all Defendants, he moves for summary judgment with respect to McCormick and Armil-only. Defendants do not cross-move asserting qualified immunity on this claim. Williams argues that the excessive force at issue occurred when McCormick handcuffed him and when Armil took him to the ground. (ECF No. 23, PageID.576.) He concedes that that there are genuine issues of material fact as to whether the other Defendants used excessive force against him and/or failed to intervene and prevent others from doing so. (*Id*. at fn. 3.)

a.    *Handcuffs*

As to Williams' handcuffs claim, he argues that the handcuffs caused an injury to his hand. (ECF No. 23, PageID.576.) To prevail at the summary judgment stage, on a handcuffs-based excessive force claim a plaintiff must show that there is no genuine issue of material fact that: (1) the plaintiff complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some physical injury resulting from the handcuffing. *Baynes v. Cleland*, 799 F.3d 600, 608 (6th Cir. 2015).

31

Williams has not set forth evidence of the first element: that he complained that the handcuffs were too tight. Additionally, the audio recording of the incident never captures a complaint regarding the handcuffs, nor is there any allegation that he complained but it was not captured on the recording. It follows, therefore, that he has not met his burden on summary judgment on the second element—that McCormick or other Defendants ignored his complaint—because he never set forth evidence that he complained. Finally, other than his general argument that his hand was injured, Williams has not presented any other evidence of injury as required by the third element. Accordingly, Williams' motion for summary judgment on his handcuffs-based excessive force claim is denied.

> b. *Takedown*

Next, Williams argues that Armil used excessive force when he took Williams down to the ground. In cases of excessive force involving a takedown, the Court must apply an "an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Dunigan v. Noble*, 390 F.3d 486,

493 (6th Cir. 2004); *see also Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

There is a three-factor test for this analysis: "[ (1) ] the severity of the crime at issue, [ (2) ] whether the suspect poses an immediate threat to the safety of the officers or others, and [ (3) ] whether he is actively resisting arrest or attempting to evade arrest by flight." *Burgess v. Fischer*, 735 F.3d 462, 472–73 (6th Cir. 2013) (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013)). Further, "[t]hese factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Id*. at 473 (citing *Graham*, 490 U.S. at 396–97).

As set forth above, Defendants were initially dispatched to Plaintiffs' apartment complex because of a suspected robbery or domestic violence crime. After Mitchell answered the door and indicated that she was fine, Defendants entered her apartment (the lawfulness of which is to be determined by a jury as set forth above). They saw Williams emerge from the bedroom wearing only boxer shorts, with bleary eyes, and slurred speech. When he took a step back into the bedroom, Defendants

ordered him to "Get down on the ground!"; "Roll on your stomach!"; and "Put your hands behind your back!" (ECF No. 22-3.) Defendants also shouted, "You're gonna get tased!" (*Id*.) In response, Williams said, "I'm not doing nothing!"; "I'm putting my hands like this!"; and, "What are they doing to me?" (*Id*.) Armil took Williams to the ground at about this point. Other Defendants testified that Williams was not punching, kicking, or the like. However, he did fall after he was handcuffed. Defendants carried him out of the apartment and into the squad car. The police report indicates that Williams was arrested for resisting arrest and obstruction of the police. (ECF No. 22-2, PageID.120.)

Defendants argue that, from their perspective, they were "entering a dimly lit apartment to inspect for signs of violence and/or injured persons." They argue it was reasonable, making a split-second judgment, to ask Williams to step into the living room to complete their investigation but that, "when Mr. Williams refused to follow these lawful commands, he was resisting and obstructing Ofc. Armil." (ECF No. 28, PageID.905–906.)

In applying the three-factor test, the Court is left to sort out what the first factor–the severity of the crime at issue–was in this case. While

34

the encounter may have started off as a suspected robbery or domestic violence situation, Defendants were not faced with any evidence of either crime at the time they encountered Williams. In *Kent v. Oakland County*, 810 F.3d 384 (6th Cir. 2016) the Sixth Circuit held that facts such as whether the individual was charged with any crime and whether the individual was told at any time that they were under arrest are considerations for the first excessive force factor. *Id.* at 390. All a reasonable officer would have known when encountering Williams was that an unknown sleepy man stepped into the living room, and then took a step back. While both robbery and domestic violence are serious crimes, Williams was not a suspect in or arrested for either. Rather, he was arrested for violating a resistance and obstruction ordinance, and charges against him were later dropped.

As to the second factor– whether the suspect poses an immediate threat to the safety of the officers or others– the facts construed in the light most favorable to Armil show that Williams may have had a hand behind his back and that Armil wanted to "ensure there was no weapon in it for his own safety and that of everyone around him." (ECF No. 28,

PageID.909.) However, there is inconsistent testimony about whether Williams had one hand behind his back. Elliott testified as follows:

> [O]nce we get him in the bedroom, he's still fighting us, he's getting a wide base, so to say, and he's got his arms and his fists clinched close to his chest, so his fists are close to his chest at this point. He's got a wide base, you know, he's crouched down, attempting—you know, wrestling with us because we're trying to get him down and he clearly does not want to get down on the ground, even though we are trying to get him down on the ground.

(ECF No. 22-6, PageID.269.) Accordingly, the facts Armil relies upon for the takedown are in dispute, and the Court cannot find that Williams posed an immediate threat to the officers.

Finally, as to the third factor– whether Williams was actively resisting arrest or attempting to evade arrest by flight– the evidence before the Court is that Williams took a step back towards the bedroom after he saw Defendants in the living room. The audio recording shows that when Defendants began yelling commands at Williams, he responded saying, "I'm not doing nothing!"; "I'm putting my hands like this!"; and, "What are they doing to me?" (ECF No. 22-3.) He was taken down almost immediately. If the officers relied only on his single step backwards, that alone does not justify a finding that Williams was

actively resisting or evading by flight. Although Armil and Elliott's testimony at trial may indicate otherwise, the record before the Court now shows that Williams was not actively resisting arrest or attempting to evade arrest. Indeed, his words that can be heard on the audio recording as set forth above indicate that he feared for his life as the encounter unfolded. He yelled, "What are they doing to me? Record them! Record them!" (ECF No. 22-3.)

The Court must consider the totality of the circumstances when considering the three factors. Significantly, the time period between Williams stepping into the living room, stepping back, and his takedown was very short. When listening to the audio recording of the encounter, it appears that approximately only one minute passed before Williams was on the ground. Defendants are not recorded asking questions of Williams, thus, any investigation before the takedown was cursory, at best. There were no obvious signs of injury on Mitchell or Williams nor were there visible weapons or other obvious threats.

For the reasons set forth above, whether Armil's takedown of Williams was excessive presents a factual dispute—namely, whether Williams had his hand behind his back—that is material to the

reasonableness inquiry, which precludes summary judgment for Williams.[7] Accordingly, Williams' motion for summary judgment on his excessive force claim related to Armil's takedown is denied.

## C.    False Arrest

Finally, Williams moves for summary judgment on his false arrest claim. As set forth by the Sixth Circuit,

> In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause. *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999). A police officer has probable cause if there is a "'fair probability'" that the individual to be arrested has either committed or intends to commit a crime. *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)), *cert. denied*, 535 U.S. 955, 122 S.Ct. 1358, 152 L.Ed.2d 354 (2002). A police officer determines the existence of probable cause by examining the facts and circumstances within his knowledge that are sufficient to inform "a prudent person, or one of reasonable caution," that the suspect "has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one

---

[7] The denial of summary judgment does not preclude a motion for directed verdict once the evidence has been presented at trial. This issue may be appropriate for a directed verdict at that time.

reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995).

*Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002).

Although most false arrest cases should be determined by a jury, this case presents a situation where summary judgment must be granted in favor of Williams as a matter of law. Williams was arrested for resisting and obstruction.[8] Defendants do not specify which provision of the Michigan obstruction statute Williams was allegedly arrested for, but it would appear that perhaps subsection (1) applies:

> an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both.

Mich. Comp. Laws § 750.81d(1). "Obstruct" is defined as "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." Mich. Comp. Laws § 750.81d(7)(a).

---

[8] Defendants' position is that Williams was arrested under the Michigan statute for obstruction, which is a felony, rather than the Southfield city ordinance for obstruction, which is a misdemeanor. (*See* ECF No. 28, PageID.909 (citing City of Southfield Ord. § 9.141).) It is notable that Williams had so little information regarding his arrest that he appears to have believed the local ordinance was applicable. (*See* ECF No. 23, PageID.578.)

As set forth above, the probable cause analysis requires a "fair probability" that Williams committed obstruction. All that the evidence shows here is that Williams stepped into the living room from the bedroom, paused, and then took one or two steps back. There is no evidence that he failed to comply with a lawful command. The audio recording reveals that the events resulting in his arrest and removal from the home transpired in a very short period of time. Any investigation that could have resulted in probable cause for an arrest for obstruction was cursory, if it occurred at all. There is no question of fact on resistance. Additionally, the case cited by Defendants in support of their position, *Saad v. City of Dearborn*, No. 10-12635, 2011 WL 3112517 (E.D. Mich. July 26, 2011) is not applicable to this case, nor is it persuasive. *Saad* regards a traffic violation stop where the police officer followed the defendant to his house and had to call for backup when the driver did not pull over when the police car's lights were flashing, nor did he follow commands.

Accordingly, the officers did not have probable cause that Williams was obstructing or resisting. Williams' motion for summary judgment is granted on his false arrest claim.

40

## IV.    Conclusion

For the reasons set forth above, the Court GRANTS Plaintiffs' motion for summary judgement as to Williams' false arrest claim and DENIES the remainder of Plaintiffs' motion for summary judgment. The Court GRANTS Defendants' motion for summary judgment only as to Williams handcuffs-based excessive force claim and DENIES the remainder of Defendants' motion for summary judgment.

IT IS SO ORDERED.

Dated: September 9, 2020                    s/Judith E. Levy
Ann Arbor, Michigan                         JUDITH E. LEVY
                                            United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 9, 2020.

                                            s/William Barkholz
                                            WILLIAM BARKHOLZ
                                            Case Manager